620 F.2d 594
 55 A.L.R.Fed. 308, 1980-1 Trade Cases 63,220
 NAVAJO TERMINALS, INC., and David H. Ratner, Petitioners,
Navajo Freight Lines, Inc., United Transportation Investment
Company, and L. Forrest Mattingley, Intervening-Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Garrett Freightlines, Inc., Intervening-Respondents.
 No. 76-1635.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 7, 1977.
Decided Sept. 28, 1979.*
Opinion March 10, 1980.
 
 James W. Rankin, Kirkland & Ellis, Chicago, Ill., for petitioners.
 Frederick W. Read, III, I. C. C., Washington, D. C., George B. Christensen, Chicago, Ill., for respondents.
 Before FAIRCHILD, Chief Judge, BAUER, Circuit Judge, and DECKER, District Judge.**
 FAIRCHILD, Chief Judge.
 
 
 1
 This is a petition to review an order of the Interstate Commerce Commission which found the petitioners (Navajo) violated § 7 of the Clayton Act by acquiring a 26% stock interest in Garrett Freightlines, Inc. Section 7 of the Clayton Act prohibits corporate stock acquisitions where in "any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition." As applied to common carriers, however, § 7 exempts mergers or acquisitions "where there is no substantial competition between the company extending its lines and the company whose stock, property, or an interest therein is so acquired." For the reasons hereinafter stated, we find that the government failed to establish a § 7 violation and therefore set aside the order of the Commission.
 
 I. BACKGROUND
 
 2
 Petitioner Navajo Freight Lines, Inc. is a motor common carrier subject to the jurisdiction of the I.C.C., holding authority to transport general commodities over a network of regular routes extending generally between Fort Wayne, Indiana and Los Angeles and San Francisco. Navajo also controls, through stock ownership, several other motor common carriers which operate generally between Washington, New York, and Boston in the East, and Rock Island, Illinois and St. Louis in the West, and between Memphis and Flint, Michigan. Navajo Terminals, Inc. is a wholly-owned subsidiary of Navajo Freight Lines. Union Transportation Investment Company (UTIC) owns approximately 90% of the stock of Navajo Freight Lines and functions primarily as a holding company. UTIC is controlled by David Ratner who is Chairman of the Boards of UTIC, Navajo Freight Lines and of Navajo Terminals. Forrest Mattingley is a former executive officer of Navajo Freight Lines and of Navajo Terminals. For purposes of brevity, these petitioners will hereinafter be referred to as "Navajo."
 
 
 3
 Respondent Garrett Freightlines, Inc. (hereinafter referred to as "Garrett") is a motor common carrier of general commodities also subject to the regulatory jurisdiction of the Interstate Commerce Commission. Garrett operates over regular routes in 14 western states, generally between St. Paul-Minneapolis, Denver, and Albuquerque, in the East, and Los Angeles, San Francisco, Portland, and Seattle, in the West. For many years, Garrett's common stock has been held by the Garrett family and others closely involved in its operation and management.
 
 
 4
 The Navajo group began to purchase Garrett stock on the market in July, 1965. By the end of 1967, Navajo had acquired approximately 115,000 shares of Garrett stock which constituted more than 10% of the outstanding shares. In July of 1967, Navajo and Garrett officers met and agreed that Navajo would refrain from exercising its cumulative voting rights to elect a director to the Garrett Board in exchange for a written agreement that Navajo would be treated as if it had an elected director. Navajo, under this agreement, was to have informal representation at Garrett Board meetings, receive unaudited financial reports, and be consulted in advance on major corporate actions and changes.
 
 
 5
 After Clarence Garrett, president and largest shareholder of Garrett, died in October, 1967, Garrett, at the direction of its new president, William Wilson, repudiated its agreement with Navajo. Wilson also persuaded owners of large blocks of Garrett stock, including the widow of Clarence Garrett, to place their shares in an irrevocable ten-year voting trust. Approximately 465,000 shares, representing 57.52% of the outstanding capital stock of Garrett, were deposited in the trust. Terms of the trust included: (1) provision for extension after the initial ten-year period; (2) termination upon agreement of all of the trustees and vote of two-thirds of all the entrusted shares; and (3) transferable trust certificates. Navajo representatives were barred from even informal attendance at Garrett Board meetings and were no longer furnished information concerning Garrett's affairs.
 
 
 6
 In response to these developments, Navajo, by virtue of its stock ownership, elected two persons to Garrett's nine-member Board of Directors. Navajo continued to have two representatives on the Garrett Board until June, 1972, when Navajo cast its votes to elect an independent shareholders' nominee. During the four years in which Navajo held two of the nine Garrett Directorships, policy changes suggested by Navajo were consistently rejected by the Garrett Board. During this time, however, Navajo continued to accumulate Garrett stock. By June, 1970 Navajo held approximately 26% of the outstanding Garrett stock. It has purchased no more since August, 1970 when it was first charged with violation of § 7 of the Clayton Act. That action, begun by the Department of Justice in a district court, was dismissed on the ground the I.C.C. had primary jurisdiction.
 
 
 7
 In February of 1971, the I.C.C. instituted an investigation to determine: (1) whether a violation of § 5(5), had occurred through control of management of Navajo and Garrett in common interest without prior Commission approval; (2) whether Navajo's acquisition of Garrett stock caused a violation of § 7 of the Clayton Act by substantially lessening competition; and (3) what relief was appropriate if any violation were found. In June, 1971 Navajo sought authority, under § 5(2) of the Interstate Commerce Act to acquire control of Garrett. This petition was consolidated with the Commission's investigation.
 
 
 8
 In February, 1972 Navajo filed a motion to withdraw its § 5(2) application and proposed to dispose of its Garrett stock by September of that year through a secondary offering to the public. After notification that the secondary offering had failed, the Commission denied Navajo's motion to withdraw its § 5(2) application. In July of 1972, Navajo notified the Commission that it had executed an agreement whereby all of its Garrett securities would be placed in an irrevocable voting trust with Valley National Bank of Arizona as independent trustee. Navajo then filed a new motion to dismiss the Commission's investigation and to withdraw the § 5(2) application.
 
 
 9
 II. THE DECISIONS OF THE ADMINISTRATIVE LAW JUDGE AND THE COMMISSION
 
 
 10
 The initial decision of the Administrative Law Judge (ALJ) was served on January 8, 1975.
 
 
 11
 The ALJ found that Navajo had attempted to buy the major stockholdings in Garrett, and that Navajo's goal was consolidation. Navajo had, however, been met with hostility and counter-measures by the Garrett interests, and Navajo did not presently have control. Hence the ALJ found there was no violation of § 5(4) of the Interstate Commerce Act.
 
 
 12
 By 1970, there were only 656 stockholders in Garrett, the stock had been dropped from the daily NASD listings, and the only likely buyers were Garrett and Navajo. The Garrett controlled voting trust held some 57% of the Garrett stock, and Navajo held some 26%, including part of the voting trust shares. The latter had been purchased from Norman Stedfeld, a Garrett officer and long time employee, who desired to retire, and felt for various reasons that he had no choice but to sell to Navajo. The ALJ found that others would inevitably find themselves in the Stedfeld situation, and in "view of all this . . . that unabated the control of Garrett by Navajo is likely and impending."
 
 
 13
 In analyzing the probable anti-competitive effect of merger or of control of Garrett by Navajo, the ALJ identified a relevant product market (line of commerce in the words of § 7 of the Clayton Act) and geographic markets (sections of the country in § 7). He found that movements of less than truckload lots (LTL) general commodity traffic over regular routes by motor common carriers, of shipments weighing between 100 and 10,000 pounds, constitute a distinguishable, specific, and relevant product market.
 
 
 14
 He found four pairs of cities to be geographic markets. He made a similar identification with respect to certain transcontinental routes and two gateway cities, but the Commission did not sustain the latter findings. Accordingly, we need be concerned only with the four city pairs, as follows:
 
 
 15
 Denver Las Vegas. Seven motor carriers moved LTL traffic in 1968 and six in 1969. Garrett ranked first in each year with 56.1 percent in 1968 and 52.9 percent in 1969. Navajo ranked seventh in 1968 with 2.6 percent and sixth in 1969 with 2.1 percent. Taken together, they would have ranked first with 58.7 percent in 1968 and 55 percent in 1969. The top four carriers accounted for 88.8 percent in 1968 and 93.5 percent in 1969, and assuming Garrett and Navajo were combined, the top four would then have accounted for 91.4 percent and 95.6 percent.
 
 
 16
 San Francisco Bay area Las Vegas. There were eight motor carriers. Garrett ranked third in 1968 with 11 percent and second in 1969 with 10.5 percent. Navajo ranked fourth in 1968 with 7.3 percent and fifth in 1969 with 5.2 percent. Taken together, they would have ranked second with 18.3 percent in 1968 and 15.7 percent in 1969. The top four carriers accounted for 88.8 percent in 1968 and 88.9 percent in 1969, and assuming Garrett and Navajo were combined, the top four would then have accounted for 94.1 percent in each year.
 
 
 17
 Los Angeles Denver. There were ten carriers. Garrett ranked fourth in each year with 14.1 percent in 1968 and 12.8 percent in 1969. Navajo ranked seventh in each year with 5.6 and 6.9 percent. Taken together, they would have ranked second in each year with 19.7 percent. The top four carriers accounted for 71.1 percent in 1968 and 65.5 percent in 1969, and assuming Garrett and Navajo were combined, the top four would then have accounted for 76.7 percent and 72.4 percent.
 
 
 18
 San Francisco Bay area Denver. There were eight carriers. Garrett ranked third with 18.3 percent in 1968 and 15.6 percent in 1969. Navajo ranked first with 24.1 percent in 1968 and 23.3 percent in 1969. Taken together, they would have ranked first with 42.4 percent in 1968 and 38.9 percent in 1969. The top four carriers accounted for 77 percent in 1968 and 73.4 percent in 1969, and assuming Garrett and Navajo were combined, the top four would then have accounted for 87.1 percent and 83.7 percent.
 
 
 19
 On the basis of the probability of Navajo acquiring control of Garrett and the concentration which would have resulted from their combination in the markets selected by the ALJ, he found that Navajo's acquisition of Garrett stock violated § 7 of the Clayton Act.
 
 
 20
 The ALJ found a number of ways in which Navajo's stock ownership and so far unsuccessful attempt to obtain control had an adverse impact upon Garrett. He detailed instances of disagreement and friction between the two Garrett directors elected by Navajo and the others. He attributed the frustration of several plans of expansion of Garrett operations to the Navajo situation. He found that a number of Garrett employees left or became apprehensive because of the expected Navajo takeover. He attributed certain instances of loss of business or threatened loss of business to concern of customers over the reports of the takeover. He found that Navajo could obtain information about traffic handled by Garrett which Navajo could attempt to take over. Although these instances doubtless had an adverse effect from the corporate point of view of Garrett, the ALJ did not attempt to spell out the adverse effect on competition in any market.
 
 
 21
 The ALJ considered the provision of § 7 of the Clayton Act, making it inapplicable to "corporations purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition." He found that Navajo did not purchase solely for investment.
 
 
 22
 Section 7 elsewhere provides that it shall not be construed to prohibit "any common carrier . . . from extending any of its lines through the medium of the acquisition of stock or otherwise of any other common carrier where there is no substantial competition between the company extending its lines and the company whose stock, property, or an interest therein is so acquired." The ALJ did not directly address the question whether the competition between Garrett and Navajo should be deemed "substantial" in the context of this provision, probably assuming that it should. He did note that consolidation "would not only eliminate their existing direct competition but also open up a direct single-line service into the described Northwestern territory (of Garrett) to Navajo."
 
 
 23
 The ALJ reviewed the agreement for the voting trust proposed by Navajo and gave detailed attention to the capability and customary practices of the proposed independent trustee. He made no finding adverse to the capability of the proposed trustee, and noted the offer of Navajo to change the trust to make it perpetual and to subject the operation of the trust to Commission approval in many respects. Nevertheless the ALJ decided that the voting trust device would probably result in more acquisitions and eventual merger. He ordered divestiture within one year.
 
 
 24
 On review, the full Commission, with one dissent, sustained the decision of the ALJ in many particulars. The Commission did reject the ALJ's findings of an interchange market or a transcontinental market of any significance to competition. Thus it found a probable anti-competitive effect only in traffic between the four city pairs.
 
 
 25
 With respect to probability of future control, the Commission said "It is not one single factor but the entire series of events and practices set forth in great detail in the record in these proceedings which leads us to conclude that it is likely, and in fact probable, that Navajo will in the future increase its percentage of Garrett stock, obtain a controlling interest in Garrett and if Navajo chooses, merge the two carriers, if remedial action is not taken. If a change in the status quo is not imposed upon Navajo and Garrett, these carriers have no reasonable choice but to seek common ground, so they are inextricably bound together."
 
 
 26
 Absent control, however, the Commission concluded that the various intrusions of Navajo into Garrett affairs, and the hostility and friction between them, are not "sufficient, under the circumstances, to constitute control or to support a finding of a violation of section 7 in their own right."
 
 
 27
 The Commission noted that the ALJ had made no specific finding as to the availability of the § 7 exemption for common carrier stock acquisitions for the purpose of line extensions. The Commission stated:
 
 
 28
 "The section 7 common carrier exemption is predicated upon a lack of substantial competition between the carriers involved in a stock acquisition. Navajo asserts that, for the purposes of this paragraph only competition must be analyzed on a system basis rather than within the defined markets in which all other antitrust analysis in these proceedings must occur. This assertion is supported neither by logic nor by the language of section 7. Section 7 is intended to preserve competition 'in any line of commerce in any section of the country.' There is no apparent reason why the concern for preservation of competition between common carriers should be only on a system-wide basis."
 
 
 29
 The Commission then made a very generalized statement that even assuming system-wide consideration were appropriate, there was substantial competition between Navajo and Garrett.
 
 
 30
 As will be seen, we disagree with the apparently preferred view of the Commission that the common carrier exemption has no force if the two carriers compete in any identifiable product market in any identifiable geographic market, and we conclude that the Commission failed adequately to measure the extent of the competition between Garrett and Navajo and to determine whether such a competition was substantial for the purpose of the common carrier exemption.
 
 
 31
 Modifying the remedy ordered by the ALJ, the Commission required divestiture within four years, with deposit of the stock in the voting trust in the interim, and forbade purchase of additional Garrett securities for ten years.
 
 
 32
 In September, 1977, after oral argument in this court, Navajo sold the Garrett stock in question and counsel for Garrett and the government suggested mootness. Navajo pointed to the prohibition against acquisition for ten years and claimed a continuing controversy, but suggested that the appropriate response to mootness would be to vacate the Commission order rather than dismiss the petition for review. Counsel for Garrett and the government opposed vacating the Commission order. Because of the continued prohibition against acquisition, we concluded the matter was not moot.
 
 III. THE ISSUES
 
 33
 Section 7 of the Clayton Act prohibits stock acquisition by a corporation where in "any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition." Because of the loyalty of the Garrett family members and employees, Navajo's ownership of 26% of the Garrett stock had not given Navajo control, and had not affected competition. The finding of violation rests on two premises: (1) that circumstances would probably develop so as to destroy the Garrett defenses and permit Navajo to acquire enough additional stock to gain control; and (2) that the combination of Navajo and Garrett under one control would significantly diminish competition in the LTL traffic between the city pairs.
 
 
 34
 Navajo contends that it was not probable that Navajo would acquire control of Garrett; that the Commission's demonstration of a substantial diminution of competition of Navajo controlled Garrett was faulty in several particulars; and that the probable diminution found by the Commission was insignificant in any event.
 
 
 35
 Navajo also contends that the common carrier exemption in § 7 applies because Navajo and Garrett are not in substantial competition.
 
 
 36
 Navajo also contends that the divestiture order was arbitrary, although the completed sale of the stock has surely rendered this point moot.
 
 IV. THE PROBABILITY OF CONTROL
 
 37
 The Commission has found, with ample evidentiary support, that until litigation began, Navajo had aggressively sought to acquire control of Garrett for the purpose of consolidating the two operations. Everyone agrees that Navajo, although obtaining a 26% interest, had failed to acquire either legal or actual control. We think it a reasonable view of the evidence, however, that the Garrett defensive tactics could not be expected to continue to be successful; that other stockholders would find it necessary to sell their stock and would likely sell to Navajo (as happened with Stedfeld); and that Navajo would be able to, and, following its original purpose, would expand its holdings into legal or actual control. Section 7 applies to an acquisition which creates a probability, and does not require an accomplished fact. Brown Shoe Co. v. United States, 370 U.S. 294, 322, 82 S.Ct. 1502, 1522, 8 L.Ed.2d 510 (1962); United States v. Marine Bancorporation, 418 U.S. 602, 622-23, 94 S.Ct. 2856, 2870, 41 L.Ed.2d 978 (1974).
 
 
 38
 It is true that when challenged, Navajo ceased further acquisition and ultimately offered to place its holdings in a voting trust. It would, however, be a stingy reading of § 7 to hold that acquisition of 26% in a deliberate attempt to obtain control is saved from being a violation by temporarily successful defenses of other stockholders and yielding to an official challenge.
 
 
 39
 Navajo also argues that because § 5(5) of the Interstate Commerce Act prohibits Navajo's acquisition of another carrier without Commission consent, the Commission's theory that Navajo would probably acquire more stock and, ultimately, control is destroyed as a matter of law. This is an unusual argument. If Navajo obtained enough stock to have control, and failed to get Commission consent, it would have violated two statutes. Ordinarily, where an act would be a violation of two statutes, that is not a defense to a charge of violating one of them. Again we note that there is abundant evidence to support the finding that Navajo had aggressively been seeking to buy enough stock to obtain control.V. THE PRODUCT AND GEOGRAPHIC MARKETS
 
 
 40
 Navajo contends that the four city pairs were economically insignificant geographic markets, and de minimis. It notes that in 1969 Garrett's combined LTL and truckload freight over the Bay Area Las Vegas route provided only $81,364 revenue and Navajo's only $48,474. Garrett's Las Vegas Denver route generated only $137,805 and Navajo's $11,334. These amounts indeed seem small, but Navajo says nothing about the extent of LTL traffic between Los Angeles and Denver and the Bay Area and Denver. We can readily take judicial notice that these places are large centers of population and business, and that LTL motor freight is a class of service important to many people. A court could scarcely overrule the Commission, with its perspective of common carrier transportation, in according significance to competition for LTL traffic between these points.
 
 
 41
 It does appear that the Commission staff originally set out to demonstrate that control of Garrett by Navajo would lessen competition in broader markets, and that concentration on LTL traffic between the four pairs of cities came late in the day.
 
 
 42
 For example, the Commission had failed to subpoena records showing the breakdown of traffic between these cities into truckload and LTL. Some of the carriers happened to provide the breakdown, but Navajo and several other carriers gave only total figures. One of Navajo's objections is that the Commission's ultimate figures were derived by applying system-wide ratios to the composite figures in order to estimate LTL traffic between these city pairs. The Commission may well be correct in asserting that any resulting inaccuracies are not of controlling significance. Moreover, since we have decided to remand on another point, this matter can be explored in the hopefully improbable event that the Commission feels that the expenditure of further energy on this matter is justified, now that Navajo has sold its stock.
 
 
 43
 Navajo also takes issue with the Commission's view that, for the present purpose, the universe of competition between these cities was that provided by the motor common carriers serving them. We are not persuaded that the real competitive market for the shipment of the weight and size involved necessarily included the services of railroads, contract carriers and others suggested by Navajo.
 
 
 44
 Navajo offers another argument why the diminution in the small number of presently competing carriers by combining two of them should not be given the weight the Commission gave. Navajo asserts that the motor carrier industry is experiencing a trend toward deconcentration, and suggests that the Commission has power to increase competition, if desirable, by issuing certificates to newcomers in any area. The Commission has this power, assuming there are qualified applicants for the area under consideration. The existence of this power may have some bearing upon the reasons for the common carrier exemption from § 7, but aside from the exemption, we are not persuaded that it has any significance in deciding whether a combination of two existing carriers will substantially lessen competition for the purpose of § 7.
 
 VI. THE COMMON CARRIER PROVISO OF § 7
 Section 7 provides, in part, as follows:
 
 45
 "Nor shall anything herein contained be construed to prohibit any common carrier subject to the laws to regulate commerce . . . from extending any of its lines through the medium of the acquisition of stock or otherwise of any common carrier where there is no substantial competition between the company extending its lines and the company whose stock, property, or an interest therein is so acquired." 15 U.S.C. § 18.
 
 
 46
 Although there is obviously a degree of overlap between some of the routes served by Navajo and Garrett, it is equally clear that each serves a large territory not served by the other. Combination of Garrett and Navajo could well be said to be an extension of Navajo's lines. The ALJ noted that consolidation would open up direct single-line service of Navajo into the Northwestern territory of Garrett. Navajo contends that "there is no substantial competition" between the two companies and that § 7 is not applicable to its acquisition of Garrett. The ultimate issue is the extent of competition which may exist without being "substantial" for the purpose of the common carrier proviso of § 7.
 
 
 47
 Evidently the draftsman of § 7 felt that without the common carrier proviso, § 7 might or would prevent mergers of carriers which accomplished desirable line extensions. The proviso was intended to prevent full scale application of § 7 to such mergers. Congress must have contemplated a public benefit from line extensions, through gains in efficiency or the like, sufficient to outweigh the destruction of minor instances of competition between the carriers.
 
 
 48
 Of course the key words in the two portions of § 7 are substantial and substantially. In the principal provision an acquisition is made unlawful if its effect may be to substantially lessen competition in any line of commerce in any section of the country. The common carrier exemption applies if there is "no substantial competition" between the two companies. The Commission seemed to treat the phrase "substantial competition" as virtually identical to "substantially to lessen competition" in the first paragraph of § 7. If these terms were truly equivalent, the common carrier exemption would serve no purpose because any acquisition that violated this first paragraph would not be protected by the exemption.
 
 
 49
 To give effect to this exemption, § 7 as a whole must be applied to carriers in this way: a first carrier serving geographic markets so much distinct from those served by a second carrier that it can be said there is no substantial competition between them can acquire the second carrier even though the resulting common control can substantially lessen competition in some specific markets where both are doing business. Such an acquisition, of course,would violate paragraph one of § 7 but for the protection of the common carrier exemption.
 
 
 50
 The Commission disposed of Navajo's contention based on the common carrier exemption virtually as an afterthought. It began by asserting that if two carriers could be deemed in competition in any line of commerce in any section of the country, e. g., as to LTL shipments between pairs of cities, there is substantial competition between the common carriers and the proviso does not apply. But if that be true, the proviso performs no function.
 
 
 51
 The second answer made by the Commission was a statement of belief, without further analysis, that because in 1969 Garrett's operations in direct competition with Navajo accounted for in excess of 28 percent of Garrett's total revenue, there was substantial competition between Navajo and Garrett on a system-wide basis.
 
 
 52
 In our opinion, this was an insufficient address to the question raised by the common carrier proviso. The substantiality of competition between Garrett and Navajo for the purpose of the proviso should have been determined upon careful analysis of the character and extent of the services as to which they can be said to compete, and whether, in proportion to their total operations the competition between them can be said to be substantial. We express no opinion as to the decision which ought to be reached on this subject.
 
 
 53
 The order of the Commission is set aside and the cause remanded for further proceedings consistent with this opinion if the Commission deems such proceedings warranted under present circumstances.
 
 
 
 *
 This appeal was originally decided by unreported order on September 28, 1979. See Circuit Rule 35. The panel has subsequently decided to issue the decision as an opinion
 
 
 **
 District Judge Bernard M. Decker of the Northern District of Illinois is sitting by designation